[No. 17156.  Department Two.  November 2, 1922.]

## WILLIAM LEDDY, *Respondent,* v. GREAT NORTHERN RAILWAY COMPANY, *Appellant.*[1]

CARRIERS (50)—OF LIVE STOCK—LIMITATIONS OF LIABILITY. Where a railroad, by its contract, undertook to furnish feed for live stock, it was required to exercise due care in furnishing it.

SAME (56)—EVIDENCE AS TO DAMAGES—ADMISSIBILITY. Upon an issue as to damages to a shipment of mules, it is not a proper basis and is inadmissible to ask a witness as to the average depreciation in value by reason of the confinement and loss of strength and health when they arrived at destination, some two weeks after the shipment; the true measure of damages being the difference in market value, if there had been no negligence by the carrier.

SAME (49, 54)—NEGLIGENCE—DUTY TO UNLOAD STOCK—LIABILITY—CONNECTING CARRIERS. An intermediate carrier of live stock is liable for acts of negligence of another road which did all the switching for several transcontinental lines at the junction point, where the shipping contract made no mention of the company doing the switching, but called for delivery to the last carrier; since such company must be held to be the agent of the intermediate carrier.

SAME (49). A carrier is liable for injury to stock, held without feed, where it furnished no adequate facilities for care of the animals at a junction point, and failed to give notice of their arrival, but for which they could have gone on without delay.

SAME (56)—DAMAGES—EVIDENCE—ADMISSIBILITY. In an action against a carrier for injury to mules while in transit through want of proper care and feed, it is error to admit evidence that some of them had been "skinned up," in the absence of any allegation of physical injury.

APPEAL (488)—DECISION—REMAND—JUDGMENT BASED ON ERRONEOUS RULING. Where respondent's judgment was reversed for error in receiving improper evidence as to depreciation in value, he is entitled to a new trial.

Appeal from a judgment of the superior court for Spokane county, Lindsley, J., entered July 6, 1921, upon the verdict of a jury rendered in favor of the plaintiff, in an action in tort. Reversed.

[1]Reported in 210 Pac. 354.

*Charles S. Albert* and *Ernest E. Sargeant,* for appellant.

*Lucius G. Nash,* for respondent.

MAIN, J.—This was an action to recover damages to two cars of stock, consisting of forty-six mules and three horses. The case was tried to the court and a jury, and resulted in a verdict in favor of the plaintiff in the sum of $1,000. At the conclusion of the plaintiff's evidence, and again at the conclusion of all the evidence, among other things, the defendant moved that there be stricken from the record and withdrawn from the consideration of the jury all of the evidence with respect to the claimed damages, on the ground that "no sufficient evidence of damage has been introduced from which the jury can determine the amount of the damage." These motions were both overruled, the cause submitted to the jury, and a verdict was returned in favor of the plaintiff in the sum of $1,000. A motion for judgment notwithstanding the verdict and, in the alternative, for a new trial was made, the former being overruled, and the latter required that the plaintiff elect to accept a judgment for $262.90 less than the amount of the verdict or a new trial would be granted. This election was made and a judgment entered for the sum of $737.10, from which the defendant appeals.

On September 3, 1920, there were shipped from Hillyard, Washington, the two cars of mules above mentioned, consigned to Grand Island, Nebraska. One of these shipments originated at Madras, Oregon, and moved from there over the Oregon Trunk Railway to Spokane, where it was transferred to the appellant's road. The other originated at Mansfield, Washington, at a station on the road of the appellant. The mules

were owned and shipped by Young & Company, a partnership composed of the respondent, William Leddy, and one F. T. Young. Prior to the institution of the action, Young assigned his interest to Leddy. From Spokane the cars moved over the line of the appellant railway company to Laurel, Montana. At this place three transcontinental railway lines meet and all the switching in transferring cars from one road to another is done by the Northern Pacific Railroad. The cars arrived at Grand Island, their destination, on the 15th of September, 1920. When the mules were unloaded, as testified to by F. T. Young, who accompanied the shipment, they were droopy, gaunted up, had fallen away in flesh, and some of them had what is called shipping fever. From time to time during the transit it was necessary that the stock be unloaded for rest, feed and water. The respondent's principal claim for damages is rested upon the failure of the appellant to furnish feed when the stock was unloaded at Great Falls, Montana, and also that, before they were again unloaded at Billings, they had been confined approximately forty hours without feed or water, which was three or four hours longer than they should have been.

It is first contended that there was no breach of duty in the failure to furnish feed at Great Falls. This contention is based upon the live stock contracts under which the shipments moved, which contained a provision that the shipper, at his own risk and expense, would load and unload the stock and would furnish an attendant to accompany it, and that "said attendant or attendants shall care for, feed and water the stock while the same is in the possession of the carrier . . . ." It is not necessary to determine the effect to be given to this provision. When the stock was

unloaded at Great Falls at about 7 o'clock in the evening, the general agent of the company at that place was applied to and furnished feed. At that time the attendant accompanying the stock was advised by the train dispatcher that he would be able to reload and get out of that place shortly after midnight. Later he was told that he could not get away until 8 o'clock the following morning. When advised of this fact, he again applied for feed to be furnished him by 7 o'clock in the morning so that the animals could be fed in time to be loaded for the 8 o'clock train. The feed was not furnished until about 11 o'clock, and the result was the stock did not leave that point until one or two o'clock in the afternoon. The appellant company, through its agent, having undertaken to furnish feed, notwithstanding the provisions of the contract, was required to exercise due care in furnishing it. In 10 C. J., p. 96, it is said:

"And where the carrier undertakes to feed and water stock notwithstanding a contract imposing this duty on the shipper, it is bound to exercise due care to see that the stock are given suitable food and water."

It is next contended that the respondent failed to prove any damages. Upon the trial, F. T. Young, who accompanied the shipment, as above stated, testified to the condition of the mules when they arrived at Grand Island. He was then asked this question: "What would have been the value of these mules per average head had they been in good condition and physical strength and health at Grand Island on the 13th day of September, 1920?" This question was objected to on the ground that it was "incompetent and irrelevant, and further that this witness has not shown his qualifications to testify in answer to the question." The objection to this question was sustained on the ground

that the witness was not qualified to testify to the market value of the mules at Grand Island on the day mentioned. After the objection to this question was sustained, counsel for the respondent stated: "Now there is another feature of this, may it please the court, and that is this: I want to call the witness to testify as to the depreciation to the intrinsic value of the mules by reason of their being confined on the cars forty-eight hours without food, rest or water. That is a subject independent of market value." And the court replied: "Yes, that is all right." The same witness was then asked this question: "Mr. Young, do you know the depreciation in value of these mules when they arrived at Grand Island, on account of their physical condition; their loss of strength and flesh; and the condition of their health when you arrived there on the 15th day of September?" And he answered: "Yes, I do." Then followed this question: "What was the average depreciation in the value; price and value of those mules by reason of the confinement and items that I have just called your attention to." This question was objected to on a number of grounds, one of which was that it was not "based upon a proper element of damages." This objection was overruled and the witness answered: "Thirty dollars." The objection to this question should have been sustained for at least two reasons. It was asked, as shown by the statement of counsel, for the purpose, not of proving market value, but intrinsic value. In 10 C. J. 387, it is said:

"In an action for loss or injury to goods shipped, it is competent to show that there was no market for the goods at the place of destination. And, where the goods lost or injured are without market value, or have no market value at the place of shipment, evidence is admissible to show their actual or intrinsic value."

And again, the question called for items of damages for which the respondent was not liable, as well as for those for which it was liable. The condition of the mules when they arrived at Grand Island, so far as this was due to the ordinary incident of the shipment, even though they were gaunted up and had lost flesh by reason of the long time that they had been in transit, would not be an item of damage for which the railroad company was liable. Its liability is based upon negligence or failure in the performance of some duty which it owed to the shipper. If it failed in its duty to furnish feed at Great Falls, and if it kept the mules confined on the cars before they were discharged at Billings for an excessive period, it would be liable so far as such failure to furnish feed and such excessive confinement contributed to the bad condition of the mules when they reached their destination. The inquiry as made was as to the depreciation of value on account of physical condition, loss of strength and flesh as well as the condition of health of the mules. They having been in transit for approximately two weeks' time (it is not claimed that there was a delay of more than two days), it is a matter of common knowledge that they would lose flesh and be gaunted up and that their condition would not be as good as at the time of shipment. The rule of damages in such a case, as stated in *Hines v. Edwards*, 228 S. W. (Tex. Civ. App.) 1117, is:

"Accurately stated, the rule of damages in actions against a carrier for injury to cattle carried by it and injured by negligence is the difference between the market value of the cattle in the condition in which they would have arrived but for the negligence of the defendant and their market value in the condition in which, by reason of such negligence, they did arrive."

That is but the statement of the general rule supported by the authorities. Had the witness's opinion as to the depreciation been merely a short way of stating the difference in value in the condition in which they arrived and the condition they would have been in had there not been any negligent acts of the railway company which contributed to their condition, it may be that the question would not have been subject to objection.

The next question is whether the appellant company is liable by reason of the excessive confinement of three or four hours before the mules were unloaded at Billings. The appellant's line ended at Laurel, Montana, or more accurately stated, at Mossmain, which is close thereto. From Laurel to Billings is fifteen miles and the running time is approximately forty minutes. As to the three trans-continental lines which meet there, the Great Northern, Burlington and Northern Pacific, the latter does all the switching. From Laurel to Billings the cars containing the mules were handled by the Northern Pacific over its track. The shipping contracts under which the stock moved make no mention of the Northern Pacific. One of the cars originated at Madras, Oregon, on the Oregon Trunk Railway, and it is as to this car that it is claimed the appellant is not liable because it was an intermediate carrier. The appellant being an intermediate carrier as to the shipment that arose at Madras, Oregon, on the Oregon Trunk Railway would only be liable for its acts of negligence and those of its agent and would not be liable for the acts of negligence of any other carrier. *Oregon-Washington R. & Nav. Co. v. McGinn,* 258 U. S. 409.

The waybills under which the stock moved make no mention of the Northern Pacific, but call for the delivery of the cars to the Chicago, Burlington and Quincy

Railroad at Billings. The details as to the arrangement made between the roads by which the Northern Pacific did the switching did not appear. We think that the Northern Pacific in transferring the cars from Laurel to Billings did so as the agent of the appellant company, and, if this be true, the appellant would be liable for the act of its agent in keeping the mules confined too long. *Ft. Worth & R. G. R. Co. v. Hasse*, 226 S. W. (Tex. Civ. App.) 448. *St. Louis, I. M. & S. R. Co. v. Edwards*, 78 Fed. 745, 24 C. C. A. 300.

In addition to this, there were no adequate facilities at Laurel or Mossmain furnished by the appellant for the taking care of the mules had they there been unloaded, which would have been within the 36-hour limit under which they were shipped. The appellant was also at fault in its failure to notify the Northern Pacific agent at Laurel that the two cars of mules would arrive there and the time of their arrival. Had this been done, they would have been able to have left Laurel and reached Billings without any excessive confinement, as the train upon which they could have gone would have been held until their arrival.

It is next contended that the trial court erred in refusing to strike certain testimony. When the witness Young was testifying as to the condition of the mules when they arrived at Grand Island, on one or two occasions he referred to them as being "skinned up." There was no allegation in the complaint of any external injury, and whether the mules were thus damaged was not an issue in the case. This question was of minor importance and would not be sufficient to justify a reversal, but inasmuch as a new trial will take place, it was thought best to here suggest the ruling that should have been made.

The final question is whether the case should go

back for a new trial or be dismissed. The respondent obtained a verdict and judgment based upon an error of the trial court in permitting the answer to the question with reference to depreciation in intrinsic value. He should not be put out of court and denied a new trial because of this error. The case of *Spokane Casket Co. v. Mitchell*, 76 Wash. 425, 136 Pac. 481, is different in this: There the proof offered was rejected by the trial court and a nonsuit was granted. The plaintiff did not obtain a verdict and judgment based upon an erroneous ruling.

The judgment will be reversed, and the cause remanded with directions to the superior court to grant a new trial.

PARKER, C. J., HOLCOMB, MACKINTOSH, and HOVEY, JJ., concur.